## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BELCHER PHARMACEUTICALS, LLC,

     Plaintiff,

v.                                   Case No: 8:17-cv-2353-T-30JSS

HOSPIRA, INC.,

     Defendant.

_____

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion to Dismiss (Dkt. 24) and Plaintiff's Opposition (Dkt. 33). The Court, having reviewed the Motion and response, and being otherwise advised in the premises, concludes that Defendant's Motion should be denied in part as explained in this Order.

## BACKGROUND

This case concerns the marketing, distribution, and sale of epinephrine injection solution products by both Belcher Pharmaceuticals, LLC ("Plaintiff") and Hospira, Inc. ("Defendant"). Plaintiff's product is FDA approved. Defendant's products are not.

In November of 2012, Plaintiff submitted a New Drug Application to the FDA for a 1 mg/mL epinephrine injection solution product. The FDA approved Plaintiff's 1 mg/mL product (NDA No. 205029) (NDC#62250-103-10) for three uses, or "indications": (1) to increase mean arterial blood pressure in adult patients with hypotension associated with septic shock; (2) for inductions and maintenance of mydriasis during intraocular surgery; and (3) for emergency treatment of allergic reactions (Type 1) including anaphylaxis.

Defendant markets and sells two epinephrine injection solution products: a 1 mg/mL Epinephrine Injection, USP (NDC#00409-724-01), and a 0.1 mg/mL Epinephrine Injection, USP (NDC#00409-4921-34). Plaintiff alleges that Defendant misleads "medical providers, wholesalers, third-party payors, pharmacists, health care professionals, insurers, prescribers, and others in the pharmaceutical industry, as well as patients or caregivers of patients who consume Plaintiff's products,"[1] to believe that Defendant's injection products are FDA approved. (Doc. 1, p. 18). Plaintiff argues that Defendant's representations about its injection products convey that Defendant's products are safer and more effective than Plaintiff's product. Plaintiff also argues that Defendant misleads consumers to believe that Defendant's injection products are superior to or interchangeable with Plaintiff's product.

Epinephrine, the primary ingredient in the parties' injection products, has long been regulated by the FDA. In August of 2014, the FDA identified a shortage in epinephrine injection products, which ended in February of 2017. According to Plaintiff, sometime before March 26, 2017, the FDA sent Defendant a warning letter instructing Defendant to stop manufacturing and selling its injection products, and Defendant complied.

Plaintiff filed suit alleging six claims against Defendant: false advertising under the Lanham Act (Count I), common law unfair competition (Count II), violations of the Florida Deceptive Unfair Trade Practices Act (Count III), unjust enrichment (Count IV), tortious interference with contract or business relationships (Count V), and civil theft (Count VI).

---

[1] In this Order, the Court refers to these identified groups as "consumers."

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint when it fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss, a court must accept all factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation omitted). It must also construe those factual allegations in the light most favorable to the plaintiff. *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (internal citation omitted).

To withstand a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Pleadings that offer only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action," will not do. *Twombly,* 550 U.S. at 555.

## DISCUSSION

The underlying dispute about the parties' injection products implicates the Federal Food, Drug, and Cosmetic Act ("FDCA") and the Lanham Act. The Court will discuss the two statutes, explain the interplay between them, and then, analyze the parties' arguments.

*The FDCA and the FDA's Enforcement of Unapproved Drugs*

The FDCA requires the FDA to approve "new drugs" for safety and effectiveness for a particular use. 21 U.S.C. § 301 *et seq*. Some drugs are exempt from this requirement under the FDCA's grandfather clauses. But courts construe the grandfather clauses narrowly and the

FDA believes that very few drugs on the market are entitled to this grandfather status. "CPG Sec. 440.100 Marketed New Drugs Without Approved NDAs and ANDAs," accessible at http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm07 4382.htm, at p. 12.

The FDA encourages drug makers to seek FDA approval for their products. On September 19, 2011, the FDA published a "Marketed Unapproved Drugs–Compliance Policy Guide" (the "FDA Compliance Guide") that outlines the FDA's enforcement policies and priorities for unapproved drugs commercially used or sold as of September 19, 2011. The FDA Compliance Guide discusses the FDA's steps to ensure that drugs comply with the FDCA or are removed from the market. *Id.* at p. 3-4. The FDA employs a "risk-based enforcement approach" with marketed unapproved drugs, meaning the FDA gives certain unapproved drugs higher enforcement priority, such as drugs that lack evidence of their effectiveness. *Id.*

The FDA Compliance Guide describes a "grace period" the FDA employs before bringing an enforcement action against an entity manufacturing, marketing, or selling unapproved drugs. *Id.* at p. 6. This grace period is applied at the sole discretion of the FDA on a case-by-case basis. The FDA considers several factors before permitting a grace period. For example, the FDA considers the effects on the public if the FDA was to immediately remove a particular unapproved drug from the market. *Id.* The FDA also recognizes a special circumstance justifying a grace period: when a company receives approval of a new drug application for a product that other companies market without approval. *Id.* at p. 7. The FDA is "more likely to take enforcement action against remaining unapproved drugs" in these

situations. *Id.* The FDA is not required to give notice of an enforcement action but will if it determines "notice is necessary or appropriate to protect the public health." *Id.* at p. 5-6.

*Section 43(a) of the Lanham Act*

The Lanham Act allows competitors to bring claims for false or misleading advertising, even when the claims challenge products regulated by the FDCA. *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2233 (2014). Section 43(a) of the Lanham Act creates a civil action for anyone who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" by "any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a).

The Lanham Act does not define the words "advertising" or "promotion," but courts within the Eleventh Circuit use a four-part test from *Gordon & Breach Science Publishers S.A. v. American Institute of Physics and American Physical Society*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994), to determine whether a representation falls under the Lanham Act. That test defines "commercial advertising or promotion" as: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. *Id.* at 1536. "While the representations need not be made in a 'classical advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Id. See also AstroTel, Inc. v. Verizon Fla.*, LLC, No. 8:11-CV-2224-T-33TBM, 2012 WL 1581596, at *7 (M.D. Fla. May 4, 2012).

To establish a false advertising claim under the Lanham Act, a plaintiff must show that: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Osmose, Inc. v. Viance*, LLC, 612 F.3d 1298, 1308 (11th Cir. 2010). The first element is satisfied if "the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). To determine whether an advertisement is false or misleading, a court "must analyze the message conveyed in full context, and must view the face of the statement in its entirety." *Incarcerated Entm't, LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220, 1230 (M.D. Fla. 2017) (citing *Osmose, Inc.*, 612 F.3d at 1308.).

<u>The FDCA and the Lanham Act</u>

The FDCA and the Lanham Act both regulate the promotion and sale of drug products in the market. But "each has its own scope and purpose…the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety." *POM Wonderful*, 134 S. Ct. at 2238. The FDCA grants the FDA near-exclusive authority to pursue violations of the FDCA. There is no private right of action under the FDCA. The Lanham Act on the other hand empowers competitors with knowledge of their own markets to sue when they suffer from another competitor's deceptive advertising practices. *Id*. at 2235-36; *Hi-Tech Pharms., Inc. v. Hodges Consulting, Inc.*, 230 F. Supp. 3d 1323, 1330 (N.D. Ga. 2016). The two statutes complement each other. *POM Wonderful*, 134 S. Ct. at 2238-39.

In lawsuits that implicate both the FDCA and the Lanham Act, issues may require a determination from the FDA instead of a court. The simplest example is when a plaintiff alleges a violation of the FDCA. Or, in a less forthright manner, when a plaintiff asks the Court to take some action that would in effect allow the party to enforce the FDCA. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993). In the marketed drug context, this could occur when a plaintiff alleges that a drug is sold unlawfully. *JHP Pharms., LLC v. Hospira, Inc.*, 52 F. Supp. 3d 992, 1003 (C.D. Cal. 2014) (stating that a Lanham Act claim challenging a product's legality "requires a determination that is within the primary jurisdiction of the FDA."). A Court cannot hear a Lanham Act claim that would "require litigation of [an] alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was a violation." *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 925 (9th Cir. 2010) (in the context of FDA approval of medical devices). And "a Lanham Act claim [that] requires direct application or interpretation of the FDCA or FDA regulations" is within the FDA's jurisdiction. *Healthpoint, Ltd. v. Stratus Pharms.*, 273 F. Supp. 2d 769, 786 (W.D. Tex. 2001).

Courts can evaluate Lanham Act claims that do not require specialized knowledge or interpretation of the FDCA's requirements. For example, courts can review a claim that a competitor falsely represented its product as FDA approved. *See, e.g.*, *Innovative Health Sols., Inc. v. DyAnsys, Inc.*, Case No. 14-cv-05207, 2015 WL 2398931, at *8 (N.D. Cal. May 19, 2015). And claims that involve whether a product's advertising misleads consumers also fall within a court's jurisdiction. *See Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics*, 104 F. Supp. 3d 348, 362 (S.D.N.Y. 2015).

*Plaintiff's Lanham Act Claim for False Advertising (Count I)*

Defendant argues that Plaintiff's lawsuit seeks to enforce the FDCA using the Lanham Act as its vehicle. Defendant states that the FDA, not the Court, has exclusive authority to determine the legality of prescription drugs in the United States. But Plaintiff does not ask the Court to determine whether Defendant is legally selling its injection product. Instead, for the most part, Plaintiff asks the Court to evaluate whether Defendant's injection products mislead consumers. This is the exact type of false advertising claim the Lanham Act allows, and encourages, post-*POM Wonderful*.

Before addressing Plaintiff's claims, the Court addresses two issues related to what the Court will consider in this Order. First, Defendant asserts that the FDA already exercised its enforcement discretion related to the issues in this case when the FDA did not ask Defendant to stop manufacturing its 1 mg/mL injection product until the FDA sent a warning letter. Defendant argues that the FDA gave Defendant a "grace period" to continue manufacturing and selling its injection product because of a nationwide shortage of epinephrine products in the market. The Court cannot assume this shortage motivated the FDA's enforcement decisions. *See Eclat Pharms., LLC v. West-Ward Pharm. Corp.*, Case No. LA CV-1306252 JAK (PLAx), 2014 WL 12598861, at *7 (C.D. Cal. July 10, 2014) ("That the FDA may not initiate an enforcement action…during the grace period does not mean that the FDA has concluded that each of them is marketing its product lawfully, or that, during this period, none of them is required to seek approval or an exemption from the FDA."). Defendant needed no letter from the FDA to know that marketing an unapproved drug was unlawful. And the

issuance of a warning letter does not prevent Plaintiff from bringing its Lanham Act claim for false advertising.

As another threshold matter, the Court will evaluate the claims only as they relate to the parties' 1 mg/mL injection products. This case involves representations about injection products' uses and stability times. The concentration of epinephrine in each injection product affects these qualities. Plaintiff only alleges that it markets and sells its own 1 mg/mL injection product, not a 0.1 mg/mL product. And Plaintiff does not specify that Defendant's 0.1 mg/mL injection product is compared to Plaintiff's 1 mg/mL injection product. As for Defendant, the Court will not credit its assertions about its 0.1 mg/mL injection product. For example, that the FDA extended the use date for Defendant's 0.1 mg/mL product has no bearing on the parties' 1 mg/mL products. All further references to a party's "injection product" are to the 1 mg/mL epinephrine injection solution product each party sells. In future pleadings, if Plaintiff wishes to make assertions about Defendant's 0.1 mg/mL injection product in relation to Plaintiff's 1 mg/mL product, it must do so with specificity.

Plaintiff's overarching claim is that Defendant markets its injection product as FDA approved and misleads consumers to believe the product is superior to, or a substitute for, Plaintiff's product. The Court addresses whether Plaintiff's claims fall within the Court's jurisdiction and then, if they do, whether they withstand Defendant's Motion.

A. FDA-Approval Status

Plaintiff alleges that Defendant misleads consumers to believe that its injection product is FDA approved. According to Plaintiff, Defendant misrepresents its FDA approval in three ways: (1) marketing, distributing, and selling its injection product in the market; (2) making

representations about its injection product's stability time and indications; and (3) describing its injection product as "AP-rated."

    1.  <u>Defendant's Injection Product in the Market</u>

Plaintiff loosely argues that Defendant's product's presence in the market implies to consumers that the product received FDA approval. Whether the marketing, distribution, and sale of Defendant's injection product misleads consumers to believe that the product is FDA approved is a question the Court can evaluate. *See Par Sterile Products, LLC v. Fresenius Kabi USA LLC*, Case No C3349, 2015 WL 1263041, at \*4 (N.D. Ill. March 17, 2015) ("…the Lanham Act is concerned to the extent it involves deception of consumers as to the fact of whether a product carries the imprimatur of FDA approval."). The determination does not require the FDA's expertise.

Turning to the merits of Plaintiff's claim, the Court does not agree that introducing a drug into the market implies FDA approval. Concluding otherwise would be contrary to the FDA's position. *See Mylan Labs*, 7 F.3d at 1139 (rejecting Mylan's arguments "that the very act of placing a drug on the market, with standard package inserts often used for FDA-approved drugs, somehow implies (falsely) that the drug had been…approved by the FDA" as "quite simply, too great a stretch under the Lanham Act" and an improper attempt to enforce the FDCA.). The Court therefore rejects the argument that Defendant's product's existence in the market misleads consumers to believe that Defendant's product is FDA approved.

2.  <u>Representations that Defendant's Product has Different/More Indications and a
    Longer Stability Time than Plaintiff's Product</u>

Defendant markets its injection product as having a longer stability time and
additional/different indications than Plaintiff's product. Plaintiff argues that these
representations imply FDA approval because consumers believe that Defendant's product was
FDA approved for the marketed stability time and indications.[2] The Court can evaluate this
claim because it too involves an alleged misrepresentation of FDA approval.

Turning to the merits of Plaintiff's claim, like Plaintiff's argument that the mere
placement of Defendant's product in the market conveys FDA approval, the Court is not
persuaded that Defendant's representations about its injection product's uses and stability
time imply that the FDA has approved the product for these uses and stability time. Plaintiff
argues that Defendant's representations mislead consumers, but Plaintiff has pled no facts to
show how the representations are false or misleading. The Court rejects the argument that
Defendant's representations about its injection product mislead consumers to believe the
product is FDA approved.

Even if the representations somehow conveyed FDA approval, Plaintiff pleads too
generally that "Defendant's products" indications mislead consumers. Plaintiff does not
specify which of Defendant's injection products–the 0.1 mg/mL or 1 mg/mL–it challenges.
As the Court mentioned, Plaintiff does not even allege that it markets, distributes, or sells a
0.1 mg/mL injection product. And naturally, a product with a different concentration of

---

[2] Later, the Court analyzes Plaintiff's argument that these same representations mislead consumers
to believe Defendant's product is substitutable for or superior to Plaintiff's product.

epinephrine could be sold with different indications since the product's concentration defines its uses.

3. <u>Representations that Defendant's Product is an AP-rated, Therapeutic Equivalent to Plaintiff's Product</u>

Plaintiff states that Defendant indicated to the federal government in its Medicaid Rebate Data Fields that Defendant's injection product was therapeutically rated as "AP." According to Plaintiff, AP-rated drugs have been approved by the FDA as "therapeutic equivalents," which are viewed by the purchasing public as FDA-approved generic versions of other FDA approved drugs. This allegedly misleading representation of FDA approval is an issue the Court can evaluate under the Lanham Act. *See JHP Pharms.*, 52 F. Supp. 3d at 1001 ("it takes no special expertise to determine whether the FDA has granted approval or not...The same thing is true of the term 'generic'."); *Par Sterile*, Case No C3349, 2015 WL 1263041, at *4 (concluding that the court could evaluate Par's Lanham act claim that defendant represented its product was FDA approved when it placed a product in the industry price lists, because the price lists were a marketing channel that buyers believed identified FDA approved drugs).

Turning to the merits of Plaintiff's claim, Defendant argues that the Medicaid website, where the information is allegedly located, is not "commercial advertising or promotion." Defendant also argues that Plaintiff fails to state a claim because Defendant provided the information to the government, not to consumers. And the information was for reimbursement purposes, not to influence consumers to buy Defendant's product.

The Court cannot determine if the Medicaid website is "commercial advertising or promotion" because the website's function in the industry is in dispute. Whether the

information given to the government and published on the Medicaid website is only for reimbursement purposes is a question of fact, as is whether prospective drug purchasers visit the website to inform their purchasing decisions and learn information about drugs in the market. The parties should note that if the operator of the website, not Defendant, misrepresented Defendant's FDA-approval status, Defendant may not be liable for this alleged Lanham Act violation.

Only Plaintiff's allegations regarding Defendant's representation of its injection project as "AP-rated" are sufficient to state a claim that Defendant marketed its product as an FDA approved generic drug in violation of the Lanham Act. If Plaintiff wishes to amend its Complaint to include other facts or representations about Defendant's product's FDA approval, the Court will allow Plaintiff to do so.

B. Stability Time and Indications

Besides Defendant's representations about stability time and indications allegedly misleading consumers to believe Defendant's product is FDA approved, Plaintiff alleges that these same representations constitute a separate Lanham Act violation. Plaintiff argues that the representations mislead consumers to believe that Defendant's injection product is superior to, interchangeable with, or an alternative to Plaintiff's product.

The Court agrees with Defendant that Plaintiff fails to state a claim. Plaintiff does not argue that Defendant's statements are false [3] or plead any facts to show how the representations, or messages implied from them, are misleading. The Court acknowledges the

---

[3] Plaintiff argues that Defendant's contraindication is false, but Defendant does not challenge this in its Motion to Dismiss.

difference between challenging, for example, whether Defendant's product should be FDA approved for a longer stability time and whether consumers are misled to believe Defendant's product has a longer stability time. But Plaintiff does not make the distinction clear in its pleading. Because of Plaintiff's insufficient facts, the claim appears to challenge the effectiveness of Defendant's injection product, which is precluded by the FDCA.

C. COD Status Code

According to Plaintiff, Defendant's use of a Covered Outpatient Drug ("COD") Status Code 12 for its injection product allows Defendant to improperly obtain reimbursements under certain federal and state healthcare programs. Plaintiff states that Defendant's injection product does not qualify for the Status Code because the Code applies to "new drugs" that qualify for coverage under 1927(k)(2)(A)(ii) of the Social Security Act. Defendant argues that Plaintiff alleges a violation of the Social Security Act, but no private right of action exists under the statute. *See Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 326 (D. Mass. 2005). The Court is not certain this is even a Lanham Act claim, and Plaintiff did not respond to Defendant's arguments. Accordingly, the Court rejects the allegations about Defendant's Status Code 12 and government reimbursements.

*Plaintiff's Claims for Unfair Competition (Count II) and a Violation of FDUTPA (Count III)*

Defendant argues that Plaintiff's claims of unfair competition and a violation of FDUTPA must fail if Plaintiff's Lanham Act claim fails because they are based on the same allegations. *See Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) (concluding that where plaintiff "is unable to bring an unfair competition claim under the Lanham Act under the theory of either false advertising or trademark

infringement, it follows that the common law claims based on unfair competition and trademark infringement must fail as well."). These claims will survive to the extent that they are based on the allegations that Defendant's injection product's AP-rating on the Medicaid website misleads consumers to believe the injection product is an FDA approved, generic version of Plaintiff's injection product. Some allegations that Defendant did not move to dismiss may support these state-law claims as well.

Defendant also argues that Plaintiff's FDUTPA claim independently fails because Plaintiff did not plead the claim with the particularity required by Federal Rule of Civil Procedure 9(b). At this time, the Court will not determine whether Plaintiff's claims require this pleading standard. The Court concludes that Plaintiff has sufficiently pled its FDUTPA claim. And because the Court is allowing Plaintiff to amend its Complaint, the Court will entertain Defendant's argument again, if it applies.

*Plaintiff's Claim for Unjust Enrichment (Count IV)*

"A claim for unjust enrichment is an equitable claim, based on a legal fiction created by courts to imply a 'contract' as a matter of law." *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999) (citing *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.,* 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997) (en banc)). "[T]he law will, in essence, 'create' an agreement in situations where it is deemed unjust for one party to have received a benefit without having to pay compensation for it." *Id*.

The elements of an unjust enrichment claim are: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it

without paying the value thereof." *Virgilio v. Ryland Grp., Inc.,* 680 F.3d 1329, 1337 (11th Cir. 2012) *(citing Fla. Power Corp. v. City of Winter Park,* 887 So. 2d 1237, 1241 n. 4 (Fla. 2004)).

Plaintiff alleges that Defendant is "piggy-backing" on Plaintiff's injection product's FDA approval, which Plaintiff expended time and resources to obtain. The Court agrees with Defendant that Plaintiff has not conferred a benefit to Defendant. And "[w]here a plaintiff predicates their unjust enrichment claim on wrongful conduct of a defendant, then the plaintiff's right of recovery, if any, arises from the wrong of the alleged tort rather than unjust enrichment." *AstroTel*, No. 8:11-CV-2224-T-33TBM, 2012 WL 1581596, at *10 (citing *Tilton v. Playboy Entm't Grp., Inc.*, 8:05–cv–692–T–30TGW, 2007 WL 80858, at *3 (M.D. Fla. Jan. 8, 2007). Accordingly, the Court dismisses Plaintiff's unjust enrichment claim.

*Plaintiff's Claim for Tortious Interference (Count IV)*

To state a claim for tortious interference with a contractual or business relationship under Florida law, a plaintiff must allege: (1) the existence of an enforceable contract, (2) the defendant's knowledge of that contract, (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract, and (4) resulting damages. *Arthrex, Inc. v. W. Coast Med. Res.*, LLC, No. 8:15-CV-910-EAK-MAP, 2015 WL 12844946, at *7 (M.D. Fla. Nov. 25, 2015). "A cause of action for tortious interference requires a showing of both an intent to damage the business relationship and a lack of justification to take the action which caused the damage." *Quintana v. Am. Sec. Ins. Co.*, No. 8:13-CV-2040-T-30MAP, 2013 WL 5177882, at *2 (M.D. Fla. Sept. 12, 2013) (internal citations omitted).

Plaintiff's claim fails because Plaintiff does not allege that Defendant *intentionally* interfered with Plaintiff's contracts or business relationships. Instead, Plaintiff alleges that Defendant's "intentional conduct" interfered. *Maxi-Taxi of Fla., Inc. v. Lee Cty. Port Auth.*, No. 2:07-CV-82FTM34SPC, 2008 WL 1925088, at *16 (M.D. Fla. Apr. 29, 2008), aff'd, 301 F. App'x 881 (11th Cir. 2008) ("In order to prevail on a tortious interference claim, a plaintiff must establish the defendant's intent to interfere, as opposed to the defendant's mere intent to act."). Plaintiff was also required to allege details of the interference such as how Defendant interfered with Plaintiff's contracts. *Krush Commc'ns, LLC v. Network Enhanced Telecom, LLP*, No. 8:13-CV-2688-T-30TGW, 2014 WL 12625758, at *3 (M.D. Fla. Apr. 29, 2014). Accordingly, the Court dismisses Plaintiff's tortious interference claim.

*Plaintiff's Claim for Civil Theft (Count VI)*

A civil theft occurs when a person "knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: (a) Deprive the other person of a right to the property or a benefit from the property or (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property." *GPS Granite Ltda v. Ultimate Granite, Inc.*, No. 8:16-CV-775-T-30AAS, 2016 WL 5816051, at *3 (M.D. Fla. Oct. 5, 2016) (citing *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1362 (M.D. Fla. 2007) (quoting Fla. Stat. § 812.014(1))). To state a claim for civil theft, a plaintiff must allege "that a conversion has taken place and that the accused acted with criminal intent." *Heldenmuth v. Groll*, 128 So. 3d 895, 896 (Fla. 4th DCA 2013) (internal citations omitted).

17

Plaintiff alleges that its valuable business assets and lawfully obtained rights to its FDA approved New Drug Application constitute the intangible property of its civil theft claim. The Court agrees with Defendant that Plaintiff does not identify any of its property Defendant obtained or used. Further, Plaintiff's allegations lack specificity. They also do not permit the Court to draw the reasonable inference that Defendant acted with criminal intent. Accordingly, the Court dismisses Plaintiff's civil theft claim.

### CONCLUSION

False advertising claims involving marketed drugs often implicate both the FDCA and the Lanham Act. This intersection of the law is still evolving. But with *POM-Wonderful*, the Supreme Court made clear that the statutes are complementary, not preclusive. Many of Plaintiff's claims involve alleged false or misleading advertising by a competitor, which is what the Lanham Act prohibits. The Court recognizes that the progression of this lawsuit could reveal issues which are more appropriate for the FDA to determine instead of the Court. But at this time, Plaintiff has stated a claim that Defendant's representation that its injection product is "AP-rated" constitutes false advertising in violation of the Lanham Act. Based on this, Plaintiff has also stated a claim for unfair competition and a violation of FDUTPA. The Court will allow Plaintiff to amend its Complaint to correct some of the deficiencies described in this Order, if it chooses. The Court asks Plaintiff to remove the allegations the Court rejected in this Order if Plaintiff cannot supplement those allegations with additional, relevant facts.

Upon review and consideration, it is therefore

ORDERED AND ADJUDGED that:

1.   Defendant's Motion to Dismiss (Dkt. 24) is DENIED in part.

2.   Plaintiff's claims for unjust enrichment (Count IV), tortious interference with a contract or business relationship (Count V), and civil theft (Count VI) are dismissed.

3.   Plaintiff's Lanham Act claim (Count I) is dismissed without prejudice, in part. The Court dismisses all of the claim's allegations about Defendant's injection product except that its AP-rated representation misleads consumers to believe that the product is an FDA approved generic version of Plaintiff's product.

4.   Plaintiff shall have fourteen (14) days from this Order to amend its Complaint, if it chooses.

**DONE** and **ORDERED** in Tampa, Florida, this 9th day of April, 2018.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record